**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GUARDS POLO CLUB HOLDINGS LTD.,       )  Case No. 11-1817 SC
                                      )
            Plaintiff,                )  ORDER DENYING REID'S
                                      )  MOTION TO DISMISS
      v.                              )
                                      )
MARGARET GOODMAN REID, MICHAEL        )
McGREGOR (a/k/a MICHAEL KOSKIE),      )
and DOES 1 through 10,                )
                                      )
            Defendants.               )
                                      )
                                      )
_____ )

## I.   INTRODUCTION

Plaintiff Guards Polo Club Holdings Ltd. ("Plaintiff" or "Guards Polo Club") commenced this action against Defendants Margaret Goodman Reid ("Reid"), Michael McGregor a/k/a Michael Koskie ("Koskie"), and Does 1 through 10 (collectively, "Defendants"), bringing claims for promissory fraud, fraudulent misrepresentation, common law fraud, and quantum meruit/unjust enrichment.  ECF No. 1 ("Compl.").  Now before the Court is a fully briefed motion by Reid to dismiss the action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; this Motion is fully briefed.  ECF Nos. 12 ("Mot."), 16 ("Opp'n"), 18 ("Reply").  For the following reasons, the Court DENIES Reid's Motion.

///
///

**United States District Court**
For the Northern District of California

## II.   **BACKGROUND**

As it must on a Rule 12(b)(6) motion, the Court assumes the truth of the well pleaded facts in Plaintiff's Complaint.[1] Plaintiff's Complaint contains detailed allegations of the events leading up to this action.  It identifies the individuals allegedly involved by name, provides specific dates and locations of meetings that allegedly occurred, and quotes from letters and e-mails allegedly sent.  The Court offers a brief summary herein.

Plaintiff is a company located in the United Kingdom and incorporated under English law.  Compl. ¶ 6.  It was founded in 1955; Price Philip, husband to the Queen of England, served as its first president.  Id. ¶ 13.  It hosts social events and organizes polo tournaments.  Id. ¶¶ 13, 15.  Plaintiff's main tournament is the Queen's Cup Tournament ("Queen's Cup"), named in honor of Queen Elizabeth II.  Id. ¶ 15.  The Queen typically attends the final match ("Queen's Cup Final") to hand out the cup to the winning team.  Id.  The Queen's Cup Final is a "main event on the English social calendar" and is attended by more than five thousand visitors each summer.  Id. ¶ 16.

In addition to member dues, Plaintiff receives income through sponsorship of its tournaments, including "title sponsorship" of the Queen's Cup.  Id. ¶ 18, 20.  Plaintiff has historically received sponsorship from luxury brands interested in being associated with the British Royal Family and "one of the most prestigious and leading polo clubs in the world."  Id. ¶¶ 20, 23. The Queen's Cup was title-sponsored by cigarette and luxury goods

---

[1] However, the Court does not accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice.  Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1031 (9th Cir. 2008).

**United States District Court**
For the Northern District of California

1   brand Dunhill from 1980 until 1999, and was later title-sponsored

2   by the luxury brand Cartier.  <u>Id.</u> ¶¶ 22, 23.

3      In 2006, Plaintiff sought new sponsorship candidates for the

4   Queen's Cup and the Queen's Cup Final.  <u>Id.</u> ¶ 23.  Plaintiff

5   alleges that because "the success, prestige and responsible

6   management of the Queen's Cup was of paramount importance" to the

7   Guards Polo Club brand, Plaintiff required "a long-term committed

8   sponsor of impeccable standing, conduct and reputation and whose

9   business was consistent with the historical branding for the

10   event."  <u>Id.</u> ¶ 24.

11      Reid and McGregor are both residents of Belvedere, California,

12   and, for the purpose of diversity subject matter jurisdiction, both

13   are citizens of California.  <u>Id.</u> ¶¶ 7, 8.  Reid and McGregor

14   jointly own a business called Vivari Group, PLC ("Vivari") that

15   "caters to people who lead or aspire to luxury lifestyles."  <u>Id.</u>

16   ¶ 25.  While Reid allegedly shuns use of the term "time share" to

17   describe the business, Vivari operates as an exclusive, invitation-

18   only "club of sorts" that entitles its members to use luxury

19   residences in historic or exotic locations.  <u>Id.</u> ¶ 27.

20      Plaintiff alleges that in early 2007, Reid told Luxury

21   Publishing CEO Alan O'Sullivan ("O'Sullivan") that she was

22   interested in arranging Vivari's sponsorship of the Queen's Cup;

23   O'Sullivan subsequently introduced Reid to Charles Sisted

24   ("Sisted"), Guards Polo Club's chief executive.  <u>Id.</u> ¶¶ 32, 33.

25   The three discussed Vivari's potential title sponsorship of the

26   2007, 2008, and 2009 Queen's Cups for a proposed sponsorship fee of

27   £750,000.  <u>Id.</u>  Reid was allegedly particularly interested in

28   access to the Royal Box at Guards Polo Club as a platform to

entertain potential investors in Vivari.  Id.

In subsequent meetings that spring, Reid and Sisted agreed on a fee of £800,000, to be paid in installments over the course of the sponsorship, with a first payment of £125,000 due upon signing and the second payment due on the start of that year's Queen's Cup tournament on June 1, 2007.  Id.

During March and April 2007, Reid and Plaintiff exchanged various drafts of the Sponsorship Agreement with "Vivari Group" or "Vivari Group PLC" as the title sponsor.  Id. ¶ 36.  By April 26, 2007, Vivari and Plaintiff had "settled on the draft text of the Sponsorship Agreement and on that day Sisted sent Reid what was supposed to be the signature copy of the Sponsorship Agreement." Id. ¶ 37.  However, two days later, Reid wrote Sisted, stating: "my partner in Vivari is not comfortable with Vivari's name signing the contract as of yet, so my company will take the burden on at this time . . . and will plan on assigning the contract at a future date to Vivari Group, PLC."  Id. ¶ 38.  Reid asked Plaintiff to replace Vivari with "2M International LLC" as the title sponsor and contracting party.  Id.

On April 30, 2007, Sisted made the requested change and sent it to Reid for her signature.  Id. ¶ 40.  The two selected May 14, 2007 as the day Reid would provide Plaintiff with a signed copy of the Sponsorship Agreement and the two would finalize logistical and organizational arrangements for the June 1, 2007 event.  Id. ¶¶ 41, 42.

On May 14, 2007, Sisted, Reid, McGregor, and others met at the Royal Box at Guards Polo Club to discuss the inaugural "Vivari Queen's Cup."  Id. ¶ 44.  Reid had not signed the Sponsorship

United States District Court
For the Northern District of California

1  Agreement, and stated that she wished to go over it and make

2  various amendments.  Id.  Reid and McGregor represented that Vivari

3  was an affiliated company of 2M International LLC.  Id.  Reid

4  stated that 2M International LLC would "act" as title sponsor and

5  pay the fee, while the "Vivari" name would be used publicly.  Id.

6  She requested that the Sponsorship Agreement's assignment clause be

7  altered so 2M International LLC could assign its interest in the

8  Agreement to Vivari without Plaintiff's approval; Plaintiff

9  consented to this change.  Id. ¶ 49.  On May 15, 2007, the

10  Sponsorship Agreement was signed.[2]

11      That year, Vivari acted as the named sponsor of the Queen's

12  Cup.  Id. ¶ 52.  The event was advertised and promoted as the

13  Vivari Queen's Cup, and Vivari's name was displayed on numerous

14  signs and banners at the club and in promotional literature.  Id.

15  ¶ 52.  Reid and her guests and corporate relations partook

16  "liberally of the hospitality and amenities offered by Guards Polo

17  Club."  Id.  Plaintiff claims that the opportunities for social

18  networking were so plentiful that when Sisted offered to introduce

19  Reid to the former prime minister of Pakistan and organize a lunch,

20  she declined the offer.  Id. ¶ 55.  Reid was introduced to Queen

21  Elizabeth during the Queen's Cup Final.  Id. ¶ 56.  Reid and her

22  corporate guests watched the Queens Cup Final both years in the

23  Royal Box, "together with members of the Royal Family."  Id. ¶ 57.

24      In the spring of 2008, Reid apparently began to miss payments.

25  Id. ¶ 60.  She wrote Sisted asking if the rest of the payments due

26  _____

27  [2] Reid filed a declaration in support of her Motion.  ECF No. 13.
   To it, she attaches what she alleges to be a true and correct copy
   of the Sponsorship Agreement.  Id. ¶ 6; id. Ex. A ("Sponsorship
28  Agreement").  Because Plaintiff does not dispute its authenticity
   and Plaintiff's Complaint depends on its contents, the Court takes
   judicial notice of the Sponsorship Agreement.

5

**United States District Court**
For the Northern District of California

for 2008 could be deferred to the following year. Id. Sisted offered to spread the 2009 and 2010 payments "in a different way," but stated that "for 2008, at this stage, I believe my hands are tied." Id. On May 8, 2008, Reid wrote Plaintiff to "confirm that we shall make the next payment within the next two weeks." Id. ¶ 62. She did not make a payment within this time frame. She sent a letter on May 23, 2008 -- one week before the 2008 Queen's Cup -- stating that she "will continue to do what is possible to abide by out commitments." Id. Plaintiff alleges that due to these promises, Plaintiff continued to prepare for the 2008 Queen's Cup. Id. ¶ 66.

As in 2007, the 2008 Queen's Cup was promoted and advertised as the Vivari Queen's Cup. Id. ¶¶ 52-57. Reid attended the event, and again took advantage of the hospitality and amenities offered under the Sponsorship Agreement. Id. She met the Queen a second time, and she and her guests watched the competition from the Royal Box. Id.

Throughout summer and fall 2008, Reid engaged in numerous meetings with Plaintiff and made additional promises to make the payments. Id. ¶¶ 79-80. On October 30, 2008, Sisted sent a letter addressed to the Board of 2M International LLC providing "formal notice" that it had breached its obligations. Id. ¶ 82. On October 31, 2008, Sisted gave 2M International LLC fourteen days to fulfill its obligations. Id. ¶ 83. On November 5, 2008, Reid wrote Sisted, stating: "I would suggest we terminate this particular agreement, agreeing that no further money is owing beyond what has been paid." Id. ¶ 86.

On November 12, 2008, Reid wrote to Plaintiff, stating that 2M

United States District Court
For the Northern District of California

International LLC was in dire financial straits due to "the severity of a downturn that has now impacted many businesses on a global scale, including 2M International." Id. ¶ 80.

In December 2008, suspecting that 2M International LLC may have entered into the Sponsorship Agreement knowing that it had insufficient funds to pay, Plaintiff asked a risk consulting and investigative company to perform an asset search in anticipation of legal action. Id. ¶ 98. Plaintiff discovered that while 2M International LLC was mentioned in Vivari's UK corporate filings, no entity named 2M International LLC with any association to Reid or McGregor had been registered in any state in the United States or in United Kingdom. Id. ¶¶ 99-100. The investigation did uncover that Reid and McGregor were involved with other entities with names similar to 2M International LLC. Id. ¶ 97.

On January 13, 2009, Plaintiff's counsel in London sent a demand and settlement letter to 2M International LLC. Id. ¶ 103. On January 21, 2009, Plaintiff's counsel wrote Reid to tell her that it appeared that 2M International LLC did not exist, and asked her to provide full details on the company including "its domicile, registration number, directors, shareholders, registered office, and accountants." Id. ¶ 105. Reid did not respond. Id.

On April 14, 2011, Plaintiff filed its Complaint, bringing four causes of action: promissory fraud, fraudulent misrepresentation, common law fraud, and unjust enrichment/quantum meruit. See Compl. Plaintiff alleges Reid and McGregor committed fraud in negotiating the sponsorship agreement and in the performance of the agreement. It alleges that Reid insisted on "2M International LLC" being the title sponsor and contracting party to

**United States District Court**
For the Northern District of California

the Sponsorship Agreement while knowing that no such entity existed.  Id. ¶ 38.  It alleges that by so doing, she promised "that she was substituting her financially stronger and more established and reliable company as contracting partner better able, and willing, to assume the financial burdens of sponsoring the 2008-2009 Queen's Cup."  Id.  It alleges that Plaintiff relied on this representation by altering the name of the title sponsor and contracting party from Vivari to 2M International LLC.  Id. ¶ 44.  It alleges that in May 2007, Reid and McGregor falsely represented that Vivari Group PLC was "an affiliated company" of 2M International, LLC.  Id. ¶ 44.  Plaintiff alleges that Reid and McGregor did so because they knew 2M International LLC as a contracting party could not be held liable in the case of breach. Id. ¶ 46.  Plaintiff alleges that during the agreement, Defendants "engaged in numerous sham communications, besides lunches and meetings with officials of Guards Polo Club during the fall of 2008 and throughout the winter into 2009 and 2010, repeatedly promising to work matters out, and asking for additional time to be able to make payment."  Id. ¶ 80.  Plaintiff alleges that Reid, McGregor, and other unnamed Defendants conspired to keep knowledge from Plaintiff and to represent 2M International LLC as a real and economically viable enterprise.

Plaintiff alleges that due to this alleged fraud, its reputation and brand have been severely damaged.  Id. ¶ 111.  It claims that it had to rush to find an alternative sponsor for the 2009 Queen's Cup, ultimately securing one "on severely reduced terms."  Id. ¶ 118.  It alleges that due to Reid's "fraudulent promises and misrepresentations," the Queen's Cup had three

**United States District Court**
For the Northern District of California

1    different sponsors in four years, "seriously undermining its image

2    of a highly desirable, exclusive sponsorship opportunity for high-

3    end luxury brands." Id. ¶ 113.  It alleges that it has been unable

4    to find another "prestigious luxury goods brand willing to sponsor

5    the Queen's Cup." Id. ¶ 117.  It claims that 2M International LLC

6    has failed to pay £487,500 under the Sponsorship Agreement.  Id.

7    Plaintiff alleges that Reid's promises to pay in 2008 induced

8    Plaintiff to not terminate the sponsorship agreement prior to the

9    2008 season.  Id. ¶ 124.

10          Reid moves to dismiss Plaintiff's Complaint.  See Mot.  Reid

11   argues that Plaintiff's claims are improperly pleaded.  Id.  She

12   alleges that she is an officer of a limited liability company

13   called "The 2MGroup International LLC." Mot. at 3.  Reid claims

14   that this company was mistakenly named as "2M International LLC" in

15   the sponsorship agreement and other communications between

16   Plaintiff and Reid.  Id.  Reid argues that the dispute is a

17   "straightforward breach of contract" action which Plaintiff has

18   characterized as a "nefarious scheme" to defraud Plaintiff.  Id.

19   She argues that the damages Plaintiff alleges flow from the 2M

20   International LLC's breach of contract, not from her alleged

21   fraudulent misrepresentations.  Id. at 4.  Reid argues that to the

22   extent she made misrepresentations, they were not material to

23   Plaintiff's decision to enter the Sponsorship Agreement.  Id. at 4.

24   She alleges that Plaintiff has failed to state a claim for "unjust

25   enrichment/quantum meruit," and that even if Plaintiff had stated a

26   claim, it would be barred by California's statute of limitations.

27   Id.

28   ///

**United States District Court**
For the Northern District of California

1    III.  **LEGAL STANDARD**

2         A motion to dismiss under Federal Rule of Civil Procedure

3    12(b)(6) "tests the legal sufficiency of a claim." Navarro v.

4    Block, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal can be based

5    on the lack of a cognizable legal theory or the absence of

6    sufficient facts alleged under a cognizable legal theory.

7    Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

8    1990).  "When there are well-pleaded factual allegations, a court

9    should assume their veracity and then determine whether they

10   plausibly give rise to an entitlement to relief." Ashcroft v.

11   Iqbal, 129 S. Ct. 1937, 1950 (2009).  However, "the tenet that a

12   court must accept as true all of the allegations contained in a

13   complaint is inapplicable to legal conclusions.  Threadbare

14   recitals of the elements of a cause of action, supported by mere

15   conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1950

16   (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  The

17   allegations made in a complaint must be both "sufficiently detailed

18   to give fair notice to the opposing part of the nature of the claim

19   so that the party may effectively defend against it" and

20   sufficiently plausible such that "it is not unfair to require the

21   opposing party to be subjected to the expense of discovery." Starr

22   v. Baca, 633 F.3d 1191, 1204 (9th Cir. 2011).

23

24   IV.  **DISCUSSION**

25        A.   **Plaintiff's Three Fraud Claims**

26        Reid argues that Plaintiff's Complaint fails to state claims

27   for promissory fraud, fraudulent misrepresentation, and fraud.

28   Mot. at 7-11.  Causes of action predicated on fraud must be pleaded

United States District Court
For the Northern District of California

with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-04 (9th Cir. 2003). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

In California,[3] the elements of a common law action for fraud or deceit are: "(1) misrepresentation of a material fact (consisting of false representation, concealment or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage." Bower v. AT & T Mobility, LLC, 196 Cal. App. 4th 1545 (Ct. App. 2011). Promissory fraud and fraudulent misrepresentation are both subspecies of this action. Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996); Manderville v. PCG & S Group, Inc., 146 Cal. App. 4th 1486, 1498 (Ct. App. 2007). A promissory fraud claim requires: "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a

---

[3] As both parties cite only California law in their Motions, the Court assumes both concede that California law applies to this action.

transaction; (4) reasonable reliance by the promisee; (5)

nonperformance by the party making the promise; and (6) resulting

damage to the promise." <u>Muraoka v. Budget Rent-A-Car</u>, 160 Cal.

App. 3d 107, 119 (Ct. App. 1984).  To establish a claim for

fraudulent misrepresentation, the plaintiff must prove:

> (1) the defendant represented to the plaintiff
> that an important fact was true; (2) that
> representation was false; (3) the defendant
> knew that the representation was false when the
> defendant made it, or the defendant made the
> representation recklessly and without regard
> for its truth; (4) the defendant intended that
> the plaintiff rely on the representation; (5)
> the plaintiff reasonably relied on the
> representation; (6) the plaintiff was harmed;
> and, (7) the plaintiff's reliance on the
> defendant's representation was a substantial
> factor in causing that harm to the plaintiff.

<u>Manderville</u>, 146 Cal. App. 4th at 1498.

The Court finds that Plaintiff has properly pleaded all three

fraud claims.  Plaintiff alleges that on numerous occasions and in

several documents, Reid identified "2M International LLC" as an

entity she controlled.  It alleges that Reid represented that this

entity was more financially secure than Vivari.  It alleges that

Reid promised on behalf of 2M International LLC to pay Plaintiff

under the Sponsorship Agreement.  It alleges that in the weeks

leading up to the 2008 Queen's Cup, Reid made numerous promises to

pay the outstanding amounts due to avoid jeopardizing Vivari's

title sponsorship of the 2008 event.  It alleges that all of these

representations were false, and that Reid knew these

representations were false when she made them.  Plaintiff alleges

that it reasonably relied on these representations by agreeing to

contract with 2M International LLC, rather than Vivari, thus

barring recovery from Vivari in the event of a breach; by

United States District Court
For the Northern District of California

accommodating Reid's request during negotiation for an altered
payment schedule, in reliance of 2M International LLC's promise to
pay; and by not treating the Sponsorship Agreement as breached,
stripping Vivari's name from the 2008 Queen's Cup, and seeking
alternative sponsorship.  It alleges that as a consequence, its
reputation was damaged and it suffered £487,500 in damages stemming
from 2M International LLC's breach.  These allegations are
plausible, given the Complaint's specificity and detail.

Reid argues that Plaintiff's fraud claims are "an improper
attempt to obtain tort damages by renaming a breach of contract
action as a fraud action."  Mot. at 8.  Reid quotes Applied
Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 515
(1994), for the proposition that an "omission to perform a contract
obligation is never a tort, unless that omission is also an
omission of some other legal duty."  Mot. at 8.  She alleges that
Plaintiff has failed to "plead an independent duty arising from
principles of tort law," and argues that as such, "it does not
matter whether Ms. Reid had no intention to honor these alleged
promises or not."  Mot. at 9.

Allied Equipment's application to this matter is limited.  In
that case, California's Supreme Court held that a party to a
contract cannot be liable in tort for interference with that
contract.  7 Cal. 4th at 517.  While Allied Equipment does require
a duty independent of the duties under the contract, it identifies
the "duty to abstain from injuring the plaintiff through express
misrepresentation" as one such duty.  Id. at 512-23; see Black V.
Bank of America, 30 Cal. App. 4th 1, 4 (Ct. App. 1994).  Here,
Plaintiff claims that Reid expressly misrepresented the existence

**United States District Court**
For the Northern District of California

1 of 2M International LLC and its ability to pay under the contract.

2 As such, <u>Allied Equipment</u> is inapposite.

3   Reid argues that the main alleged misrepresentation -- the

4 existence of 2M International LLC -- is not material.  She admits

5 that no entity named 2M International LLC exists, but argues that

6 another entity, The 2MGroup International LLC, existed at the time

7 of the Sponsorship Agreement.  She claims that her references to 2M

8 International LLC were mere mistakes.  In support, she references

9 the articles of organization for "The 2MGroup International LLC,"

10 filed with California's secretary of state on March 7, 2006.  ECF

11 No. 14.[4]  Reid declares that she caused these articles of

12 organization to be filed.  Reid Decl. ¶ 2.  She alleges that at the

13 time the parties entered into the Sponsorship Agreement, this

14 entity "had an Operating Agreement, had issued shares of stock, had

15 Articles of Incorporation, had officers and a Board and otherwise

16 adhered to all appropriate corporate formalities."  <u>Id.</u> ¶ 4.

17   The Court rejects this argument, as it requires the Court to

18 make a factual finding as to the materiality of the alleged

19 misrepresentation.  Furthermore, the judicially noticed articles of

20 organization do not contain Reid or McGregor's name, and they offer

21 no support for Reid's allegation that the entity complied with "all

22 appropriate corporate formalities."

23   Reid argues that the damages sought in this action stem from

24 2M International LLC's breach and not from any independent tortious

25 act on her part.  The Court rejects this argument.  It is

26 questionable whether under California law, Plaintiff can recover

27

28 [4] Reid seeks judicial notice of this document.  The Court GRANTS
  this request.

14

from Reid the £487,500 Plaintiff claims 2M International LLC failed to pay under the Settlement Agreement.  However, Plaintiff also claims that as a consequence of its reliance on Reid's alleged misrepresentations, its reputation was damaged, which has hindered its ability to attract luxury brand sponsors.  In light of all the facts pleaded, this allegation is plausible, and it sufficiently supports Plaintiff's fraud claims.

**B.   Plaintiff's Claim for Quantum Meruit/Unjust Enrichment**

Reid argues that Plaintiff's fourth cause of action for "quantum meruit/unjust enrichment" fails because California does not recognize a cause of action for unjust enrichment, and to the extent Plaintiff brings a claim for quantum meruit, it is barred by the statute of limitations.  Mot. at 12.

In California, "[u]njust enrichment is not a cause of action. Rather, it is a general principle underlying various doctrines and remedies, including quasi-contract." Jogani v. Super. Ct., 165 Cal. App. 4th 901, 911 (Ct. App. 2008) (citations omitted). However, quantum meruit is a recognized cause of action; it is "a quasi-contract action to recover the reasonable value of services rendered." Id. at 208.  "Where one performs for another, with the other's knowledge, a useful service of a character usually charged for, and the latter expresses no dissent, or avails himself of the service, a promise to pay the reasonable value of the services is implied." Gray v. Whitmore, 17 Cal. App. 3d 1, 24 (Ct. App. 1971).

Momentarily setting aside Reid's statute-of-limitations argument, the Court finds that Plaintiff has pleaded a plausible quantum meruit claim.  Plaintiff alleges that Reid personally received benefits from the Sponsorship Agreement; she and her

**United States District Court**
For the Northern District of California

1   guests attended the 2007 and 2008 Queen's Cup Final, and she used

2   this exclusive opportunity to network.  As such, Reid was availed

3   of an opportunity Plaintiff usually charged for, and she may be

4   liable for the reasonable value of these and other services.

5   Turning to Reid's statute of limitations argument, as an

6   action for liability not founded upon a written contract, a quantum

7   meruit claim is typically subject to a two-year statute of

8   limitations, with the cause of action accruing upon the plaintiff's

9   discovery of the loss or damage.  Cal. Civ. Proc. Code § 339(1).

10  However, an action for "fraud or mistake" does not expire until

11  three years after "the discovery, by the aggrieved party, of the

12  facts constituting the fraud or mistake."  Id. § 338(d).  Plaintiff

13  argues that its quantum meruit claim sounds in fraud, and thus

14  section 338(d), rather than section 339(1), should apply to this

15  claim.  The Court agrees.  Plaintiff alleges that through

16  misrepresentation, Reid personally received benefits under the

17  Sponsorship Agreement.  Plaintiff alleges that it first learned of

18  this misrepresentation in January 2009.  As such, the April 14,

19  2011 filing of this action renders Plaintiff's claim timely.

20  However, to the extent Plaintiff's quantum meruit claim is not

21  premised on fraud, it is barred under section 338(1).  As such, the

22  practical effect of the Court's holding is that Plaintiff must

23  prove an additional element -- Reid's fraud -- to prevail on its

24  quantum meruit claim.

25  ///

26  ///

27  ///

28  ///

**V.**   **CONCLUSION**

For the above reasons, the Court DENIES Defendant Margaret Goodman Reid's Motion to Dismiss.

IT IS SO ORDERED.

Dated:  August 9, 2011



UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California